**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 1, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

  Plaintiff - Appellee,

v.                                                    No. 13-7036

MICHAEL SALAS,

  Defendant - Appellant.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 6:12-CR-00070-RAW-1)**

---

Aaron S. Haas, Salmon & Haas, San Antonio, Texas, for Appellant.

Linda A. Epperley, Assistant United States Attorney (Mark F. Green United
States Attorney, and Shannon L. Henson, Assistant United States Attorney, with
her on the brief) United States Attorney's Office, Muskogee, Oklahoma, for
Appellee.

---

Before **LUCERO**, **TYMKOVICH**, and **BACHARACH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

Michael Salas was pulled over for erratic driving and consented to a search

of his car, which yielded over 20 pounds of methamphetamine. He pleaded guilty

to one count of possession with intent to distribute the meth.

Salas challenges the district court's denial of his motion to suppress the drug evidence. He contends the district court erred in finding that the police officer had reasonable suspicion to stop his car based on a violation of an Oklahoma fog line statute that requires driving "as nearly as practicable entirely within a single lane." Okla. Stat. § 11-309. He also appeals the district court's sentence based on the court's refusal to decrease his offense level by one point under § 3E1.1 of the United States Sentencing Guidelines (USSG) for acceptance of responsibility and the court's refusal to issue a downward departure for minor or minimal participation in criminal activity under § 3B1.2.

Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM both the denial of the motion to suppress and Salas's sentence. The district court correctly found that the officer had reasonable suspicion to stop Salas for violating the Oklahoma traffic statute and that Salas consented to the search of his car. Based on the facts of this case, the district court did not clearly err by refusing to decrease Salas's offense level for acceptance of responsibility where the government had already begun trial preparations. Nor did the district court clearly err in refusing to issue a downward departure where Salas failed to prove he was a minor or minimal participant in the scheme.

## I. Background

Salas was passing through Oklahoma on his way from Arkansas to Texas on a summer afternoon. Deputy Jeffrey Gragg was engaged in traffic control on

Interstate 40, immediately east of a bridge crossing the Arkansas River in Muskogee County. Gragg often patrolled in this area because there was a curve in the road immediately after the bridge that can be a safety concern. Gragg testified at the suppression hearing that the weather conditions were good that day; it was overcast and there were light and variable winds but that the wind was not so strong that it would affect a passenger vehicle.

From his station in the center median, Gragg noticed a Ford Taurus traveling westbound cross the fog line, the yellow or white line on the right side of the highway. According to Gragg, he observed the vehicle cross "halfway across the fog line" on the right side of the highway. App. 55. Gragg testified that he decided to follow the car because he thought the driver might be tired, under the influence of a narcotic, or texting. After waiting for several cars to pass by, Gragg pulled into the left lane of the highway and began following the Taurus.[1] Gragg testified that he pulled even with the vehicle to check how many people were in the car, and noticed that the driver had a "pretty good grip" on the steering wheel and would not look in his direction. App. 58. Gragg then slowed down and fell behind the Taurus so he could run the plates.

---

[1] While he was following, Gragg testified that he saw the Taurus change into the left lane without signaling—a traffic violation—and then move back to the right lane, this time signaling. On cross examination, however, he later said that he was not "100 percent sure" that Salas crossed into the passing lane without signaling. App. 84.

It was at this point, Gragg testified, that he saw the Taurus cross the fog line a second time. After it crossed the line the second time, Gragg testified that the Taurus slowed down so that "it put me almost actually out in front of him." App. 59. He then followed the car for about five minutes until he could get to a safe area to stop the vehicle. He testified that, although he hit his emergency lights, which triggers the patrol car's video record mechanism to begin recording one minute prior to the lights activation, all the traffic violations he observed occurred before the video began recording.

After both cars pulled over on the shoulder, Gragg approached the Taurus and informed the driver, Salas, that he stopped him because he had crossed the fog line several times. He asked Salas if he had had anything to drink, but Salas responded that he was just tired. Gragg ran Salas's valid Georgia driver's license, which revealed no outstanding warrants. Gragg asked Salas to sit in the passenger seat of his patrol car while he wrote the warning for the traffic violation. Salas told Gragg that he had driven from McKinney, Texas, around 8 that morning to gamble at a casino in Fort Smith, Arkansas, but could not remember the name of the casino. Salas also mentioned that he was unemployed and was then living with his sister in Dallas while he looked for a job. Gragg testified that these statements raised his suspicions because it seemed unlikely

-4-

that someone would drive several hundred miles to gamble for only a few hours.[2] Gragg testified he also became suspicious when a check on the plates on the Taurus revealed that the car was a "high-end rental" and that Salas had paid an extra fee to rent it because he was under age 25. App. 66.

After issuing Salas a warning for failure to stay in his lane, Gragg returned Salas's documents and told Salas he was "good to go." App. 67. Salas thanked him for giving him a warning and offered to shake Gragg's hand. Immediately after that, while Salas was still standing near the passenger side of Gragg's car, Gragg asked Salas if he had time for a few more questions. Salas replied, "Sure." App. Dash Cam Video, 15:03:01. In response to Gragg's questions, Salas denied having anything illegal in his car, including drugs or any large sums of money. Gragg then asked if he could search the vehicle. Gragg testified he thought Salas "said no that he didn't mind." App. 70. Gragg then told Salas to stay in the patrol car, and to hit the siren if he needed anything. In the car, Gragg found two cell phones and boarding passes from Mexico to Dallas. Gragg unlocked the trunk, which contained a suitcase and several stacks of clothes. Upon unzipping the suitcase, Gragg discovered nine one-gallon bags containing a white substance that later tested positive for methamphetamine. The weight totaled almost 20 pounds.

---

[2] Salas told Gragg that he had once won $1000 at the casino he had just visited, but that $100 was his limit and that he had already lost $100 that day.

Salas was charged with one count of possession with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). He moved to suppress the evidence uncovered from his car, arguing that Gragg lacked reasonable suspicion or probable cause to stop Salas and that Salas did not validly consent to search the car.

The district court denied the motion to suppress because it found that Gragg had reasonable suspicion to stop Salas based on the fog line violation. The district court found credible Gragg's testimony that the vehicle crossed the fog line twice, but held that even one violation would have given reasonable suspicion to stop Salas because Salas "crossed halfway onto the shoulder" and any light and variable winds would not have pushed him that far over the fog line. App. 115. The district court's order did not mention the search, but the court adopted the magistrate judge's report, in which the magistrate judge concluded the search was consensual. App. 103.

Following the denial of his motion to suppress, Salas entered a guilty plea to the single count in the indictment. The district court accepted the presentence report's recommended base offense level and sentenced Salas to 151 months' imprisonment and three years of supervised release.

## II. Analysis

Salas challenges the search and the sentence imposed by the district court. As we explain, neither challenge is meritorious.

### A. *Fourth Amendment Claim*

In reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error, considering the evidence in the light most favorable to the government. *United States v. Fox*, 600 F.3d 1253, 1257 (10th Cir. 2010). We review the district court's ultimate determination of reasonableness under the Fourth Amendment de novo. *Id.*

### 1. *The Initial Stop*

Salas first challenges the lawfulness of the initial traffic stop. Because a traffic stop is a seizure under the Fourth Amendment, it must be justified at its inception—when the officer intrudes on the motorist's liberty interest. *United States v. Martinez*, 512 F.3d 1268, 1272 (10th Cir. 2008). A traffic stop is justified at its inception "if the officer has either (1) probable cause to believe a traffic violation has occurred or (2) a reasonable articulable suspicion that 'this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.'" *Id.* (quoting *United States v. Ozbirn*, 189 F.3d 1194, 1197–98 (10th Cir. 1999)). Whether reasonable suspicion exists is an objective inquiry determined by the totality of the circumstances, and "an officer's subjective motivation for the stop 'play[s] no role in ordinary [reasonable suspicion] Fourth Amendment analysis.'" *United States v. Harmon*, 742 F.3d 451, 456 (10th Cir. 2014) (alteration in original) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)); *see also United States v. Botero-*

*Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) ("[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.").

The relevant Oklahoma statute in this case in effect at the time of the stop provided that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane." Okla. Stat. § 11-309.[3] Contrary to Salas's arguments, we have held that even a single violation of a traffic statute virtually identical to § 11-309 can provide reasonable suspicion for a stop based on all the surrounding facts and circumstances. *See Harmon*, 742 F.3d at 458; *United States v. Alvarado*, 430 F.3d 1305, 1308 (10th Cir. 2005); *United States v. Cline*, 349 F.3d 1276, 1287 (10th Cir. 2003); *United States v. Zabalza* , 346 F.3d 1255, 1258 (10th Cir. 2003); *Ozbirn*, 189 F.3d at 1198.

---

[3] Although Oklahoma state courts have not authoritatively interpreted this statute, at least one Oklahoma court has held that an officer had reasonable suspicion to stop a defendant where the defendant violated § 11-309 by crossing the "center-dividing line of a four lane highway and veering back to the shoulder of the road." *Hutchinson v. State*, 562 P.2d 867, 870–71 (Okla. Crim. App. 1977). And we have held that an officer had reasonable suspicion to stop a defendant for violating § 11-309 because the statute "encompasses crossing the center line and the shoulder line." *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998).

*Harmon* is instructive. There, we held that a traffic stop based on a similar New Mexico statute, N.M. Stat. Ann. § 66-7-317,[4] was reasonable where the record indicated no evidence of difficult or adverse driving conditions, the driver was weaving in his lane, and "at one point [the driver's] front and rear passenger tires 'crossed over the outer white line' before coming back into the lane." 742 F.3d at 453. Likewise, in *Alvarado* we found that an officer had reasonable suspicion to stop a car for violating a Utah statute, Utah Code Ann. § 41-6-61(1),[3] where the car crossed about one foot over the right fog line and the record also indicated that there were no adverse weather conditions or obstructions in the road. 430 F.3d at 1306–07.

Salas argues that the video does not show Salas crossed the fog line twice, as the district court found. He argues that at best there was only one violation, which occurred immediately after a curve in the road and that it was not practicable to stay in the lane at that juncture "because of the way the wind interacts with the road." Aplt. Br. at 13. Salas is correct the video does not show the fog line violations. But Gragg testified that all of the traffic violations occurred before the video began recording, which explains their absence from the

---

[4] N.M. Stat. Ann. § 66-7-317 requires a vehicle to be "driven as nearly as practicable entirely within a single lane."

[3] Utah Code Ann. § 41-6-61(1) in effect at the time provided that "[a] vehicle shall be operated as nearly as practical entirely within a single lane." *Alvarado*, 430 F.3d at 1308.

footage.[4]  Gragg also testified that the distance between the point when he saw the first fog line violation to the point when he activated his emergency lights was over six miles and took almost five minutes to traverse.  App. 61–62.  Viewing the evidence in the light most favorable to the government and giving due weight to the district court's findings regarding Gragg's credibility, as we must, we conclude the district court's finding that two violations occurred was not clearly erroneous.  *See United States v. Kitchell*, 653 F.3d 1206, 1216 (10th Cir. 2011) ("Judging the credibility of the witnesses, determining the weight to be given to evidence, and drawing reasonable inferences and conclusions from the evidence are within the province of the district court." (citations and internal quotation marks omitted)); *see also id.* at 1215 ("[T]his court accepts the factual findings of the district court, and its determination of witness credibility, unless they are clearly erroneous." (citations and internal quotation marks omitted)).

But even assuming for the sake of argument that only a single fog line violation occurred, Gragg still had reasonable suspicion to stop Salas.  Salas's Ford Taurus was a four-door sedan that would have been unaffected by any light winds, not a top-heavy large truck or a U-haul trailer.  *See United States v. Vazquez*, 555 F.3d 923, 928 (10th Cir. 2009) ("[I]n any event Mr. Vazquez's 2003 Honda Civic was a low-profile compact car unlikely to be affected by the wind.").

---

[4]  The patrol car's camera continuously records footage but only begins saving the footage one minute prior to the activation of the car's emergency lights.

The district court's findings that any light and variable winds would not have caused Salas's car to drift halfway over the fog line are therefore not clearly erroneous. *See id.* ("A finding of fact is not clearly erroneous unless it is without factual support in the record, or unless the court after reviewing all the evidence is left with a definite and firm conviction that the district court erred."). And although the initial fog line violation occurred near an area where there was a curve in the road, this is not the type of treacherous terrain that would cause a driver to veer halfway over the fog line. *See United States v. Tang*, 332 F. App'x 446, 452 (10th Cir. 2009) (finding reasonable suspicion to stop for fog line violation where, "[a]lthough it was dark and there was a mild to moderate wind, the interstate was not winding or narrow and only curved gradually to the left"); *cf. United States v. Gregory*, 79 F.3d 973, 978 (10th Cir. 1996) (no reasonable suspicion to stop U-haul truck for a single violation of a fog line statute where "[t]he road was winding, the terrain mountainous and the weather condition was windy").

Under the totality of these circumstances, Gragg had reasonable suspicion that Salas had violated § 11-309. The initial stop of Salas's car was therefore reasonable under the Fourth Amendment.

### 2. Consent to Search

Salas next argues that the ensuing search of Salas's car violated the Fourth Amendment because the stop was illegal and there was "no meaningful break or

intervening circumstances between the stop and the consent to search." Aplt. Br. at 21. The government argues that Salas voluntarily consented to the search of his vehicle after the stop had already ended and turned into a consensual encounter.

A vehicle may lawfully be searched if "a person in control of the vehicle has given his voluntary consent to the search." *United States v. Lyons*, 510 F.3d 1225, 1239 (10th Cir. 2007) (citations and internal quotation marks omitted). Whether a person gave voluntary consent is a question of fact to be determined by the totality of the circumstances and is reviewed for clear error. *See id.* The government bears the burden of showing the consent was voluntary by (1) proffering "clear and positive testimony that consent was unequivocal and specific and freely given" and (2) proving that "this consent was given without implied or express duress or coercion." *Id.* (citations and internal quotation marks omitted).

Salas asks us to apply the three-factor test originally articulated in *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975), which requires the government to bear a heavier burden when consent is given *after an illegal stop*. *See United States v. Fernandez*, 18 F.3d 874, 881 (10th Cir. 1994). This higher standard requires the government to prove, based on the totality of circumstances, "a sufficient attenuation or break in the causal connection between the illegal [stop] and the consent." *Fox*, 600 F.3d at 1259 (citations and internal quotation marks omitted).

-12-

Three factors inform our inquiry under this standard: (1) the temporal proximity of the illegal stop and the consent; (2) any intervening circumstances; and (3) the purpose and flagrancy of the officer's unlawful conduct. *Id.* at 1259–60. But, as we stated above, there was no unlawful seizure in this case, and therefore the government need not bear that heavier burden. *See Fernandez*, 18 F.3d at 881; *United States v. Deases*, 918 F.2d 118, 122 n.1 (10th Cir. 1990). Moreover, Salas does not argue that the encounter between Gragg and Salas *after* Gragg returned his papers was an unlawful detention, only that Gragg lacked reasonable suspicion to stop Salas in the first place. Salas has therefore waived any argument that the consent was tainted by the post-detention encounter between Gragg and Salas when Gragg began questioning Salas. *See United States v. Almaraz*, 306 F.3d 1031, 1041 (10th Cir. 2002).

The district court did not make any specific findings regarding the voluntariness of Salas's consent to search. But in denying the motion to suppress the district court adopted the magistrate judge's recommendations and report, which found that Salas consented to the search. And we are "obliged to affirm the district court's suppression ruling if any reasonable view of the evidence supports that ruling." *United States v. Cardenas-Alatorre*, 485 F.3d 1111, 1119–20 (10th Cir. 2007) (citations and internal quotation marks omitted).

After reviewing the record, we agree that Salas voluntarily consented to the search of his car. The dash cam video indicates that after Gragg returned Salas's

-13-

documents, Salas opened the passenger door, exited the car, and shook Gragg's

hand. Salas voluntarily answered Gragg's questions regarding any illegal

possessions in the car. When Gragg asked if he could search the car, Salas

replied, "Sure." Gragg asked him, "You sure you don't mind?" Salas responded,

"No." App. Dash Cam Video 15:03:00-15:03:20.[5] Salas's relaxed demeanor and

the absence of any physical coercion or intimidating body language or tone by

Gragg lead us to the conclusion that Salas voluntarily consented to search the car.

In sum, the district court did not clearly err in finding that Salas voluntarily

consented to the search of his car. Gragg's search was accordingly lawful under

the Fourth Amendment.

### B. Section 3E1.1 Acceptance of Responsibility

Salas also contends the district court erred in refusing to reduce the offense

level by one point for acceptance of responsibility under USSG § 3E1.1(b).

Because Salas preserved this objection at the sentencing hearing, we review the

district court's legal conclusions under the Guidelines de novo and its findings of

fact for clear error, giving "great deference to the district court's application of

the Guidelines to the facts." *United States v. Heredia-Cruz*, 328 F.3d 1283, 1288

---

[5] Salas implies that he was scared because of Gragg's dog in the back of
the patrol car. But this fact alone is not sufficient to show undue coercion,
particularly given that the dog was in the back of the car and did not have any
contact with Salas. *See United States v. Manjarrez*, 348 F.3d 881, 886 (10th Cir.
2003) (drug dog howling loudly during trooper's questioning did not render
consent involuntary).

(10th Cir. 2003). Salas bears the burden of establishing that he is entitled to a § 3E1.1 reduction by a preponderance of the evidence. *Id.*

If the defendant has an offense level of 16 or greater, § 3E1.1(b) provides for an additional one-point decrease in the offense level for acceptance of responsibility "*upon motion of the government* stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, *thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently*." (emphasis added).[6] We have held that § 3E1.1(b) confers on the government "a power, not a duty, to file a motion when a defendant has timely notified prosecutors of an intention to plead guilty." *United States v. Moreno-Trevino*, 432 F.3d 1181, 1186 (10th Cir. 2005) (citations and internal quotation marks omitted). Thus, even if a defendant timely notifies the government of his intent to plead guilty, "such timeliness does not automatically entitle him to the government's filing for the additional adjustment." *Id.* at 1186.

Although the government's discretion to file a § 3E1.1 motion is broad, it is not unfettered. *United States v. Evans*, 744 F.3d 1192, 1199 (10th Cir. 2014). A

---

[6] Note 6 to § 3E1.1 also states, "Because the Government is in the best position to determine whether the defendant has assisted authorities in a manner that avoids preparing for trial, an adjustment under subsection (b) *may only be granted upon a formal motion by the Government at the time of sentencing*." USSG §3E1.1 cmt. n. 6 (emphasis added).

district court may review the government's decision not to file a § 3E1.1 motion and grant a remedy if it finds the refusal was "(1) animated by an unconstitutional motive, or (2) not rationally related to a legitimate government end." *Id.* (citations and internal quotation marks omitted); *accord United States v. Blanco*, 466 F.3d 916, 918 (10th Cir. 2006). We review the district court's decision to accept or reject the government's refusal to file a § 3E1.1(b) motion for clear error. *Evans*, 744 F.3d at 1199.[7]

Salas urges us to side with the decisions of two other courts of appeal holding that a court may direct the prosecutor to file a § 3E1.1(b) motion even if the prosecutor's reason did not violate the Constitution. *See United States v. Lee*, 653 F.3d 170, 174–75 (2d Cir. 2011); *United States v. Divens*, 650 F.3d 343, 346–47 (4th Cir. 2011). But *Lee* and *Divens* are distinguishable from this case. In *Lee*, the court held that the government's refusal to move for a reduction under § 3E1.1(b) was based on an unlawful reason because it was undisputed that the

---

[7] Most other circuits considering § 3E1.1(b) agree with our framework for reviewing the government's decision not to file a § 3E1.1(b) motion. *See, e.g., United States v. Foreman*, 2014 WL 945324 (4th Cir. Mar. 12, 2014), *cert. denied*, 2014 WL 1392599 (2014); *United States v. Davis*, 714 F.3d 474, 475 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 462 (2013); *United States v. Collins*, 683 F.3d 697, 707 (6th Cir. 2012), *cert. denied*, 133 S. Ct. 571 (2012); *United States v. Moore*, 683 F.3d 927, 930–31 (8th Cir. 2012); *United States v. Johnson*, 581 F.3d 994, 1000–07 (9th Cir. 2009); *United States v. Beatty*, 538 F.3d 8, 13 (1st Cir. 2008); *United States v. Drennon*, 516 F.3d 160, 162–63 (3d Cir. 2008); *United States v. Sloley*, 464 F.3d 355, 360–61 (2d Cir. 2006); *United States v. Gunn*, 215 F. App'x 785, 791 (11th Cir. 2007).

guilty plea "spared the government from preparing for trial." 653 F.3d at 174.

And *Divens* concerned the government's failure to file the § 3E1.1(b) motion

because the defendant refused to sign an appellate waiver as part of a plea

agreement where there was no evidence the government had been forced to

prepare for trial or that the appellate waiver would conserve trial resources. *See*

*Divens*, 650 F.3d at 347 n.2; *Foreman*, 2014 WL 945324, at *4 (noting that

*Divens* does not mandate the government to file a § 3E1.1(b) motion if the

defendant's delay in pleading guilty required the government to prepare for trial).[8]

Here, in contrast, the government actually began trial preparations. Two

weeks after Salas filed the motion to suppress, the government notified him that,

in response to the motion to suppress, the government was beginning trial

preparations. The government never received a response, and the suppression

hearing took place six days after the date of the letter. Nearly one month after the

suppression hearing, the district court issued an order denying Salas's motion to

suppress. Nevertheless, three days after the order denying his motion to suppress,

Salas filed proposed jury instructions and a proposed verdict form. The

government filed its trial brief three days later. It was only the day the

government filed its trial brief that Salas indicated he wanted to plead guilty.

---

[8] We also note that several other courts of appeal have upheld the
government's decision not to file a § 3E1.1(b) motion because the government
was forced to litigate a motion to suppress. *See Collins*, 683 F.3d at 704;
*Drennon*, 516 F.3d at 161–63.

Contrary to Salas's arguments, the government's stated reason for refusing to file the § 3E1.1(b) motion—avoiding litigation and conserving resources—is rationally related to the legitimate government interest in the efficient allocation of its resources. It does not appear that the government ever received any indication from Salas that it should refrain from or cease its trial preparations; indeed, Salas filed jury instructions and a proposed verdict after the suppression order issued and well after he had received notice the government was preparing for trial, indicating a continued desire to proceed to trial. *See United States v. Drennon*, 516 F.3d 160, 161 (3d Cir. 2008) (government did not abuse its discretion in refusing to file § 3E1.1(b) motion because defendant did not notify government of his intention to plead guilty until after suppression hearing and government stated that the "large majority of the work to prepare for trial had been done in connection with the suppression hearing"); *cf. United States v. Price*, 409 F.3d 436, 443–44 (D.C. Cir. 2005) (defendant was entitled to § 3E1.1(b) reduction where very early in the case defendant indicated that he was likely to plead guilty if he lost his motion to suppress and government did not prepare for trial); *United States v. Marquez*, 337 F.3d 1203, 1212 (10th Cir. 2003) (§ 3E1.1(b) reduction required where defendant "filed a non-frivolous motion to

suppress, and there is no evidence that the government engaged in preparation

beyond that which was required for the motion").[9]

We also see no basis to conclude that the government's refusal to file the

§ 3E1.1(b) motion was animated by an unconstitutional motive.  An

unconstitutional motive is one that is based on the defendant's race, religion, or

gender.  *See Blanco*, 466 F.3d at 919; *Moreno-Trevino*, 432 F.3d at 1185.  Here,

there is no evidence the government's stated reasons for preparing for trial were

motivated by any of these concerns.  Nevertheless, Salas argues that the

government's refusal was in retaliation for invoking his constitutional right to file

a motion to suppress.  *See* Aplt. Br. at 28; Reply Br. at 13.  But, as we stated in

*Blanco*, Salas "misunderstands the scope of our review." 466 F.3d at 919.  In

*Blanco*, we declined to consider whether the prosecutor acted for a

constitutionally impermissible reason where she withheld a § 3E1.1(b) motion

after the defendant asked to have the drugs at issue reweighed at an independent

facility.  The prosecutor explained her decision to withhold the motion because

"the reweighing in itself required the government to draft an order, to make

arrangements . . . [and] to tie up an FBI agent for a number of hours taking the

evidence out of the evidence room, transporting it to an independent lab, [and]

---

[9] We find *Price* and *Marquez* instructive even though both cases used the version of the Guidelines prior to the 2003 amendment to § 3E1.1(b).  The previous version of § 3E1.1(b) required the district court to award the one-point reduction if the defendant met the required criteria.  *See United States v. Haggerty*, 731 F.3d 1094, 1100 & n.4 (10th Cir. 2013).

sitting and waiting." *Id.* at 917. There, as here, the defendant argued that the prosecutor's decision unconstitutionally interfered with his constitutional rights. But we held that the defendant's argument was "beyond the scope of appellate review." *Id.* at 919.

Even if we were to consider Salas's contentions, we disagree with them. Here, the prosecutor alerted Salas that he was beginning trial preparations in response to the motion to suppress because he believed the motion evinced Salas's intent to go to trial. Faced with a hearing on Salas's motion to suppress scheduled only a few months before trial and having received no indication Salas wanted to plead guilty or enter a conditional guilty plea, the government continued to prepare for trial. We find that the government's trial preparations—and resulting refusal to file a § 3E1.1(b) motion—were not motivated by an unconstitutional reason. *See id.* at 919 ("[W]hen a defendant chooses to trade the exercise of [his constitutional rights with respect to his criminal trial] for a reduction in sentence, this does not mean the government has 'interfered' with the right. Rather, it means that he has exercised the right in a particular way: namely, by exchanging it for valuable consideration. . . . It is not unconstitutional to deny him the benefit of the choice he did not make."); *see also Corbitt v. New Jersey*, 439 U.S. 212, 218 (1978) ("[N]ot every burden on the exercise of a constitutional right, and not every pressure or encouragement to waive such a right, is invalid.").

Accordingly, where, as here, the government had actually begun preparing for trial and there is no evidence that Salas indicated to the government he intended to plead guilty until the government had already begun trial preparations, we agree that the government's decision to withhold the § 3E1.1(b) motion was not arbitrary or unconstitutionally motivated.

### C. *Section 3B1.2 Minor or Minimal Role*

Finally, Salas contends that the district court erred in refusing to reduce his sentence under § 3B1.2 based on his status as a minor or minimal participant in the crime. We review the sentencing court's factual decisions for clear error and its legal conclusions de novo. The defendant bears the burden of proving by a preponderance of the evidence whether an adjustment under § 3B1.2 is warranted. *Martinez*, 512 F.3d at 1275.

The district court did not clearly err in concluding that Salas did not qualify as a minor or minimal participant. Section 3B1.2 provides a range of mitigating role adjustments for defendants whose part in the offense makes them "substantially less culpable than the average participant." USSG § 3B1.2 cmt. n.3(A). The adjustment "is not applicable unless more than one participant was involved in the offense." *Id.* § 3B1.2 cmt. n.2. We have held that a "participant" for purposes of § 3B1.2 need not be charged with the offense of conviction to be considered as a participant under the Guidelines. *See United States v. Bowen*, 437 F.3d 1009, 1019 n.5 (10th Cir. 2006); *see also Martinez*, 512 F.3d at 1276 n.3

-21-

("Charged only with the amount of drugs he personally transported, Martinez of course was not categorically precluded from receiving a minor participant adjustment." (citing USSG § 3B1.2 cmt. n.3(A)).

Salas argues that the district court impermissibly concluded that it could not award him a mitigating adjustment because he was only charged with his own conduct. We disagree. Although the district court commented that Salas's role in the offense should be based only on his individual conduct if his "offense level [is] based only on his individual conduct rather than . . . that of a larger conspiracy or scheme," the court also stated that "in addition to the lack of verifiable participants, [Salas] has failed to show that his conduct was less culpable than the other participants in this case." App. 175. We therefore cannot conclude that the court expressly based its reasoning on the wrong legal standard. *See Bowen*, 437 F.3d at 1020 (declining to find that district court applied an incorrect legal standard where the court denied motion for mitigating role without mentioning lack of authority to rule, despite the court's comment that it would be "difficult to apply the mitigating role adjustment" where defendant was the only person charged with the crime). We find that the district court's comments at sentencing "stopped short of holding" that it did not have the authority to grant Salas a reduction under § 3B1.2(a) because he was only charged with his own conduct. *Id*.

We also conclude that the district court did not commit clear error by declining to grant an adjustment based on Salas's argument that he was only a courier for the drugs. The district court found that Salas had failed to present sufficient evidence that other participants in the scheme existed or that he was less culpable than any of the other participants. App. 175. At sentencing, the only evidence Salas presented to support his claim were his own assertions that he was a one-time courier and was far less culpable than the other participants. App. 158. But a "defendant's own assertion that he was a minimal participant is not enough to overcome the clearly erroneous standard." *United States v. Virgen-Chavarin*, 350 F.3d 1122, 1131 (10th Cir. 2003) (citations omitted).

Furthermore, Salas's courier status alone does not entitle him to an adjustment for a minor or minimal role. *Martinez*, 512 F.3d at 1276 ("[W]e have consistently 'refused to adopt a per se rule allowing a downward adjustment based solely on a defendant's status as a drug courier.'" (quoting *United States v. Rangel-Arreola*, 991 F.2d 1519, 1524 (10th Cir. 1993))); *United States v. Eckhart*, 569 F.3d 1263, 1276 (10th Cir. 2009). We have held that "[t]o debate whether couriers as a group are less culpable would not be productive, akin to the old argument over which leg of a three-legged stool is the most important leg." *Martinez*, 512 F.3d at 1276 (citations and internal quotation marks omitted). Thus, even assuming that Salas had sufficiently proved the existence of other participants in the scheme—an assumption with which the district court

disagreed—Salas has not borne his burden of showing by a preponderance of the evidence that he was substantially less culpable than any of the other participants in the drug distribution network.  The district court's decision not to grant Salas minor or minimal participant status was not clearly erroneous.

## III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of Salas's motion to suppress the drug evidence.  We also AFFIRM Salas's sentence.