FILED
United States Court of Appeals
Tenth Circuit

April 8, 2015

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

VERDELL MAYS,

     Defendant - Appellant.

------------------------------------

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

DAMIAN MAYS,

     Defendant - Appellant.

No. 14-3106
(D. Kansas)
(D.C. No. 2:12-CR-20141-KHV-22)

No. 14-3117
(D. Kansas)
(D.C. No. 2:12-CR-20141-KHV-13)

_____

ORDER AND JUDGMENT[*]

_____

Before **HARTZ**, **HOLMES**, and **PHILLIPS**, Circuit Judges.

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Defendants Verdell Mays and his nephew, Damian Mays, belonged to a drug-trafficking conspiracy that operated in the Kansas City area from 2006 through 2012. Both pleaded guilty to (1) conspiracy to manufacture, possess, and distribute cocaine, cocaine base, and marijuana and to maintain a drug-involved premises, *see* 21 U.S.C. §§ 841(a)(1) and 856; and (2) using a communication facility to facilitate a drug-trafficking offense (Damian pleaded to two such counts), *see id.* U.S.C. § 843(b).  On May 15, 2014, the United States District Court for the District of Kansas sentenced Verdell to 225 months' imprisonment and Damian to 220 months.  Each appealed his sentence, and the appeals have been consolidated.[1]  They challenge the calculation of their offense levels under the sentencing guidelines.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.    DISCUSSION

We review the district court's legal conclusions de novo and its factual findings for clear error, "giving great deference to the . . . court's application of the Guidelines to the facts."  *United States v. Salas*, 756 F.3d 1196, 1204 (10th Cir. 2014) (internal quotation marks omitted).  "A finding is clearly erroneous only if it is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made."  *United States v. Shippley*, 690 F.3d 1192,

---

[1] After examining the briefs and appellate record in Appeal No. 14-3106 (the appeal of Verdell Mays), this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  That case is therefore ordered submitted without oral argument.

1199 (10th Cir. 2012) (brackets and internal quotation marks omitted). We address Verdell's arguments first.

## A.    VERDELL MAYS

Verdell complains that his offense level was improperly enhanced on three grounds: maintaining a premises for drug manufacture or distribution, possession of a firearm in connection with a drug offense, and being responsible for a sufficient quantity of drugs to require a base offense level of 32. To put his arguments in context, we summarize the relevant evidence.

On November 10, 2009, police officers executed a search warrant at 2269 Russell, Kansas City, Kansas. They found the following: In the kitchen were seven electronic scales with residue, four razor blades with residue, five boxes of baking soda, 15 empty medicine bottles, five mason jars with residue, a metal pot with residue, a Pyrex measuring cup, nine boxes of sandwich bags, a metal spoon with residue, and a melted plastic bag with an unknown substance. A letter addressed to Verdell was in a kitchen drawer. A firearm, a pistol magazine, and a bullet were on a table in the living room. In the southwest bedroom were two baggies of crack cocaine and $942 in a jacket pocket. And in the closet of the northwest bedroom were $976 in a shoebox, a rifle magazine, and a pouch containing a motor vehicle registration for Verdell, a traffic ticket issued to him, and a letter addressed to him.

At Verdell's sentencing hearing, Officer Dillon Passinese explained the use of Pyrex cups, baggies, digital scales, and baking soda in the manufacture and sale of crack

cocaine. He testified that although the residence contained a couch, a dining room table, and clothing, there was no bedroom furniture. He said that "it appear[ed]. . . that [the] residence was used for the purposes of making or manufacturing cocaine" because "it didn't appear to be lived in for any other reason." R. (Verdell 14-3106), Vol. 2 at 123.

Detective Joseph Daneff testified about what he had learned during his investigation, which included wiretaps. Coconspirator Gregory Moore told him that he and Verdell began engaging in drug transactions in 2006 or 2007. Verdell acted as "a middleman." *Id.* at 70. He would purchase cocaine from Anthony Smith and then sell that cocaine to Moore. Many of these transactions occurred "at an address believed to be owned by Verdell Mays at 2269 Russell." *Id.* at 71. Daneff also interviewed Smith, who said that his drug transactions with Verdell began in 2004 or 2005 and that he supplied Verdell with various quantities of cocaine. Smith estimated that he had provided Verdell with at least 10 kilograms altogether. Daneff also testified that he knew "during the course of the investigation [that Smith and Verdell] were closely associated," *id.* at 100, and that he had no "reason to doubt [Smith's] veracity as to the calculation of 10,000 grams of powder cocaine" because "his information [was] consistent with the information that other individuals told [him]," *id.* at 100.

Djuane Sykes testified that Verdell purchased the residence at 2269 Russell in 2007 and that he "moved in with [Verdell] and [they] proceeded to work out of it." *Id.* at 183. He said that he and Verdell would "hang out" and manufacture drugs there, *id.* at 185, and that people frequently came to the house to purchase crack cocaine. In addition,

4

he sold Verdell firearms while they lived at the house and Verdell carried firearms on his person, including a .40 caliber Glock that he carried for protection. Sykes also said that Smith, known to him only as Anthony, sold Verdell cocaine in amounts of half a kilogram and a kilogram.

Moore, who the investigation identified as the head of the drug-trafficking organization, testified that he began a drug-trafficking association with Verdell in 2007 or 2008 and that Verdell obtained cocaine for him, although sometimes Moore sold cocaine to Verdell. Moore said that Smith and Verdell were "drug partners" for "a little while." *Id.* at 139–140. He identified a picture of 2269 Russell as Verdell's house and said that on one occasion he had seen an assault rifle lying by the front door and that sometimes Verdell would have a gun on him at his house. He acknowledged that he saw Verdell manufacture crack cocaine there on one occasion and that sometimes drugs were sold there.

### 1. Maintaining a Premises for Purpose of Drug Manufacture or Distribution

The guidelines direct a sentencing court to increase the offense level by two levels "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." USSG § 2D1.1(b)(12) (2013).[2] "Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than

---

[2] All citations to the guidelines are to those in effect when the defendants were sentenced in July 2014.

one of the defendant's incidental or collateral uses for the premises." *Id.* § 2D1.1 cmt. n.17. The district court found that Verdell maintained 2269 Russell for the "purposes of manufacturing or distributing a controlled substance." R. (Verdell 14-3106), Vol. 2 at 224.

Verdell argues that there was insufficient evidence to support the district court's finding because "[t]he testimony of the cooperating co-defendants was so unreliable as to justify a finding that a sentence based upon it must be set aside." Aplt. (Verdell 14-3106) Br. at 27. He also contends that even if "there is sufficient evidence that [he] maintained the premise [at 2269 Russell,] . . . the testimony of the cooperating co-defendants did not support a finding that manufacturing or distributing a controlled substance was one of [his] primary or principal uses for the premises." *Id.* at 28.

We reject Verdell's challenge to the veracity of his codefendants' testimony. Credibility determinations are left to the sound discretion of the sentencing court, and "we will not hold that testimony is, as a matter of law, incredible unless it is unbelievable on its face, i.e., testimony as to facts that the witness physically could not have possibly observed or events that could not have occurred under the laws of nature." *United States v. Hoyle*, 751 F.3d 1167, 1175 (10th Cir. 2014) (brackets and internal quotation marks omitted).

Moreover, Verdell ignores the evidence found in the house. The enhancement was appropriate in light of the evidence of drug manufacture found there and the supporting testimony of Sykes, Moore, and Officer Passinese. *See United States v. Cortez-Diaz*, 565

6

F. App'x 741, 748 (10th Cir. 2014) (no furniture and "only noted contents [in house] were seven pounds of methamphetamine, drug packaging materials, a digital scale, and [subordinate's] luggage"); *see also United States v. Bell*, 766 F.3d 634, 637 (6th Cir. 2014) ("house contained the 'tools of the trade'"). Verdell points out that he slept there and his friends used the house as a "hangout." Aplt. (Verdell 14-3106) Br. at 28. That evidence, however, does not compel the conclusion that drug manufacture and distribution were merely incidental. The house had no bedroom furniture, but it did contain a number of items necessary for the drug trade: seven digital scales, five boxes of baking soda, nine boxes of sandwich bags, and two baggies of crack cocaine, among other evidence of drug manufacture. We affirm the application of the enhancement.

### 2.     Possession of a Firearm

The guidelines provide for a two-level enhancement for the possession of a dangerous weapon in connection with a drug-trafficking offense. USSG § 2D.1.1(b)(1). "The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." *Id.* § 2D1.1, cmt. n.11(A). "Possession of a weapon in connection with a drug trafficking offense is established if the government proves by a preponderance of the evidence that a temporal and spacial relation existed between the weapon, the drug trafficking activity, and the defendant." *United States v. Alexander*, 292 F.3d 1226, 1231 (10th Cir. 2002) (internal quotation marks omitted). "The necessary nexus . . . may be established by showing that the weapon was located nearby the general location where drugs or drug paraphernalia are

stored or where part of the transaction occurred." *Id.* (internal quotation marks omitted).

"[O]nce the government establishes that the gun was possessed in proximity to the drugs or transaction, the burden shifts to the defendant to show it is clearly improbable that the weapon was related to the offense." *Id.* at 1232 (internal quotation marks omitted). The district court found that Verdell possessed a weapon in connection with his offense, based on the credible testimony of Moore and Sykes and the evidence from the search of the house.

Verdell argues that "[t]he only evidence of [his] possessing a weapon came from the cooperating co-defendants whose testimony . . . proved to be unreliable." Aplt. (Verdell 14-3106) Br. at 25. But the district court could properly credit that testimony and, again, Verdell disregards the physical evidence against him. Officers found a gun and ammunition on a table in the living room and multiple items associated with drug manufacture in the kitchen. They also found a large amount of cash and a rifle magazine in the northwest bedroom. And in both the kitchen and the bedroom, they found documents addressed to Verdell. The government demonstrated the requisite connection between the gun, the drug offense, and the defendant. *See United States v. Williams*, 431 F.3d 1234, 1238 (10th Cir. 2005) (gun and digital scale found in living room and crack cocaine found on kitchen table); *United States v. Smith*, 131 F.3d 1392, 1400 (10th Cir. 1997) (gun "found in the garage near the entrance to [defendant's] drug lab"). Although Verdell contends that "[t]here was no evidence that any weapons were seized from [him] nor . . . that law enforcement ever observed [him] in possession of a weapon."

8

Aplt. (Verdell 14-3106) Br. at 26, such evidence is unnecessary, *see United States v. Pompey*, 264 F.3d 1176, 1181 (10th Cir. 2001) (gun need not be seized from defendant directly). And Verdell made no showing that it is clearly improbable that the firearms were connected with the offense. The enhancement was appropriate.

### 3. Drug Quantity

The base offense level for a drug offense ordinarily depends on the quantity of drugs attributable to the defendant. *See* USSG § 2D1.1(a)(5). "When the actual drugs underlying a drug quantity determination are not seized, the trial court may rely upon an estimate to establish the defendant's guideline offense level so long as the information relied upon has some basis of support in the facts of the particular case and bears sufficient indicia of reliability." *United States v. Dalton*, 409 F.3d 1247, 1251 (10th Cir. 2005) (internal quotation marks omitted). If more than one drug is attributable to the defendant, the quantity of each is converted to a marijuana equivalent, and those equivalents are added.

The district court attributed to Verdell 10,397 grams of powder cocaine and 220 grams of cocaine base. The marijuana equivalent of the powder cocaine was 2,079.4 kilograms, and the equivalent of the cocaine base was 785.62 kilograms, for a total of 2,865.02 kilograms. *See* USSG § 2D1.1 cmt. n.8(D) (equivalency tables). The base offense level was 32 for a marijuana equivalent of at least 1,000 kilograms but less than 3,000 kilograms. *See id.* 2D1.1(c)(4).

9

Verdell argues that "there was insufficient evidence to support the drug amounts that were attributed to [him]." Aplt. (Verdell 14-3106) Br. at 23. He asserts that Moore's testimony "was shown to be completely untrustworthy," *id.* at 24, and that because "[n]either Anthony Smith nor Ralph Mayo testified," their statements in the presentence report should not have been used to calculate the drug amounts, *id.* at 23–24. We are not persuaded.

"In sentencing, a district court may rely on hearsay evidence as long as the evidence is sufficiently reliable." *United States v. Caiba-Antele*, 705 F.3d 1162, 1165 (10th Cir. 2012). Detective Daneff testified that Smith had estimated that he sold Verdell 10 kilograms of cocaine. Daneff said that he had no reason to doubt Smith's veracity and that his estimate was consistent with information he received from other people he interviewed. The court was entitled to credit that testimony. *See United States v. Easterling*, 921 F.2d 1073, 1077–78 (10th Cir. 1990) (accepting testimony of probation officer based on interviews of two individuals who had purchased drugs from defendant). Further, that testimony was supported by the testimony of both Sykes and Moore. Because five kilograms of powder cocaine was sufficient to support Verdell's base offense level of 32, *see* USSG § 2D1.1(c)(4), we need not address the additional amounts the court attributed to him.

### B.    DAMIAN MAYS

In sentencing Damian, the district court imposed enhancements for possession of a firearm, *see id.* § 2D1.1(b)(1); reckless endangerment during flight, *see id.* § 3C1.2; and

obstruction of justice, *see id.* § 3C1.1.  Damian challenges all three enhancements.  Aplt. (Damian 14-3117) Br. at 6.

### 1.      Possession Of A Firearm

The district court concluded that there were "three different avenues" for imposing the firearm-possession enhancement.  R. (Damian 14-3117), Vol. 2 at 84.  One avenue the court relied on was "the testimony of Mr. Sykes who noted Mr. Damian Mays' possession of a firearm at various drug transactions."  *Id.* at 84.  Because we can affirm on the basis of this testimony, we do not address the other avenues.

Sykes testified at the sentencing hearing that Damian came to his uncle's house at 2269 Russell at least 10 times to purchase cocaine from them and that he sometimes brought pistols with him.  Sykes said that Damian carried firearms because "[h]e had quite a few enemies" and that "his family had been . . . in battle . . . with another [well-known drug-trafficking] family."  *Id.* at 20.  Damian apparently concedes that he possessed a weapon during these transactions but argues that "[his] possession of a weapon was not done in furtherance of a drug conspiracy."  Aplt. (Damian 14-3117) Br. at 7.  He contends that "the familial relationship between [him] and his uncle [Verdell] renders it unlikely that the weapons were part and parcel of drug activities," *id.* at 7–8, and that "[t]he mere fact that guns were present when drug transactions occurred does not necessarily prove that the guns were possessed in connection with the drug conspiracy," *id.* at 8.

But the guidelines do not require the gun possession to be "in furtherance of the conspiracy." The government must prove only that the gun "was present or possessed either during the charged offense or during other drug trafficking activity that was part of the same course of conduct or common scheme or plan as the offense of conviction." *Shippley*, 690 F.3d at 1199 (internal quotation marks omitted). The government met its burden here. We see no relevance to the fact that he carried the guns while purchasing drugs from his uncle rather than a nonrelative.

### 2. Reckless Endangerment

A sentencing court may impose a two-level enhancement "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." USSG § 3C1.2. The district court imposed the enhancement after finding that Damian fled from police officers at a high rate of speed on two separate occasions in the weeks before his arrest. Damian does not appear to dispute that the incidents amounted to reckless endangerment but argues that "[t]he government failed to identify [him] as the driver." Aplt. (Damian 14-3117) Br. at 6. We disagree.

Officers began their attempts to find and arrest Damian in December 2012. On December 4 they contacted several of his family members, and "a male at an address that Damian Mays was known to frequent" told officers that Damian was aware of the arrest warrant and officers would never find him. R. (Damian 14-3117), Vol. 2 at 58–59.

12

Officer William VonWolf testified about the first fleeing episode at the sentencing hearing. In late January 2013, police officers attempted to stop a black Chevy Impala to check the car for a suspected fugitive. When they activated their emergency lights and sirens, the car drove away at a speed estimated by VonWolf to be twice the 25- to 35-mile-per-hour speed limit. The area it drove through was a residential area with single-family houses, and the episode was in the afternoon after school had let out. Because of the danger to the public, the officers did not pursue the car. But VonWolf testified that before officers tried to stop the Impala, he observed in the driver's seat a black male whom he could not identify. He recognized the same car, however, when Damian was arrested the following week; and he identified the car as the one shown in photos of Damian's car because both cars had a Kansas temporary tag with a cover over it and the same tinting on the windows.

The second occasion was on February 4, 2013. Sergeant Mark Mosbacher testified that he tried to stop a black Chevy Impala that fled at an estimated 90 miles per hour in a 35-mile-per-hour zone. Mosbacher identified photos of Damian's car as showing the same car; he pointed to the Kansas temporary tag with a thick plastic cover and the unusual tinting on the windows.

The police apprehended Damian on February 7, 2013, at a motel in Kansas City, Missouri. A black Chevy Impala was parked there. In it, officers found a bag of marijuana with Damian's fingerprints. A woman in the room with him at the time of his arrest admitted to officers that Damian had given her the Impala's keys and told her not

13

to give them to the police.  After the arrest Detective Daneff questioned Damian.  When he asked Damian about the two prior pursuits, Damian indicated that Daneff "may have been making . . . some of it up."  *Id.* at 57.  But when Daneff provided details about the pursuits and asked Damian "if [he] was making that up," he responded, "I know you're not making it up."  *Id.* at 57–58.

In light of the evidence presented, we cannot conclude that the district court clearly erred in finding that Damian was the driver who fled the police.  *See Shippley*, 690 F.3d at 1199–1200 ("It is not enough that the finding is possibly or even probably wrong; the error must be pellucid to any objective observer." (internal quotation marks omitted)).  Accordingly, we affirm the enhancement.

### 3.    Obstruction Of Justice

The district court imposed a two-level enhancement for obstruction of justice under USSG § 3C1.1 because Damian refused to provide a voice exemplar following a court order.  Damian refused to provide an exemplar on two occasions, initially requesting the presence of counsel but later refusing to provide the exemplar when counsel was present.  Even after a hearing on the Government's motion to hold him in contempt, he refused to provide the exemplar, and the court held him in contempt.

Damian argues that the district court erred in imposing the enhancement because he eventually pleaded guilty and therefore "his decision not to provide a voice exemplar had no bearing on the prosecution."  Aplt. (Damian 14-3117) Br. at 6.  But the enhancement clearly applies to attempts.  The guidelines require that "the defendant

14

willfully obstructed or impeded, or *attempted to obstruct or impede*, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction."  USSG. § 3C1.1 (2013) (emphasis added).  Other circuits agree that the obstruction of justice need not be successful.  *See United States v. Maccado*, 225 F.3d 766, 772 (D.C. Cir. 2000) ("the conclusion that a plea could erase an actual obstruction of justice would be inconsistent with § 3C1.1's inclusion of attempts"); *United States v. Greer*, 158 F.3d 228, 238 (5th Cir. 1998); *United States v. Carter*, 510 F.3d 593, 599 (6th Cir. 2007); *United States v. Yusufu*, 63 F.3d 505, 515 (7th Cir. 1995); *United States v. Baker*, 894 F.2d 1083, 1084 (9th Cir 1990).

Damian also argues that if he had gone to trial, "the government would have been entitled to introduce his refusal to provide the exemplar into evidence," which "would have made the government's point, and likely more forcefully."  Aplt. (Damian 14-3117) Br. at 11.  But even if "the government eventually managed to find a way around" his obstruction, the enhancement would apply.  *United States v. Taylor*, 88 F.3d 938, 944 (11th Cir. 1996).

## II.     CONCLUSION

We AFFIRM the sentences of both defendants.

ENTERED FOR THE COURT


Harris L Hartz
Circuit Judge


15