**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 22, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

LUCAS GREGORY FOX,

      Defendant-Appellant.

No. 09-5131

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. No. 4:09-CR-00038-TCK-1)**

---

Stephen J. Greubel, Assistant Federal Public Defender, Office of the Federal Public Defender, Tulsa, Oklahoma, for Defendant-Appellant.

Janet S. Reincke, Assistant United States Attorney, (Thomas Scott Woodward, Acting United States Attorney, with her on the brief), Tulsa, Oklahoma, for Plaintiff-Appellee.

---

Before **BRISCOE, SEYMOUR,** and **LUCERO**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

      Defendant-Appellant Lucas Gregory Fox entered a conditional guilty plea

to one count of possession of an unregistered shotgun with a barrel less than 18

inches long, in violation of 26 U.S.C. §§ 5841, 5845(a), 5861(d), and 5871. Law enforcement officers found the firearm in Fox's home after his wife consented to the search. Fox appeals the denial of his motion to suppress evidence, arguing that his wife's consent to search the home was invalid. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and reverse and remand for further proceedings.

I

At approximately 9:45 p.m. on February 4, 2009, Officers Dupler, Jenkins, Lamb, and Osterdyk of the Tulsa Police Department were in plain clothes and unmarked cars, conducting surveillance on Fox's home in Tulsa, Oklahoma. Officer Dupler had received information from a confidential informant that Fox was driving a stolen silver Jeep Wrangler and that he might have drugs with him. Officer Dupler also learned that Fox was wanted on an outstanding arrest warrant. While the officers were observing Fox's house, they saw a black Ford Mustang park near the house and a woman (later identified as Shawna Chiles) get out of the Mustang and enter the house. Approximately thirty minutes later, Ms. Chiles left the house, got back in her car, and drove away. Two officers, Officers Lamb and Osterdyk, followed the black Mustang in their unmarked police car.

Shortly after Officers Lamb and Osterdyk drove away, the silver Jeep Wrangler pulled into Fox's driveway. Fox got out of the Jeep, and Officers Dupler and Jenkins arrested him. By this time, Officers Lamb and Osterdyk had lost the black Mustang and had returned to Fox's house. While Officers Lamb

2

and Osterdyk were walking towards the house, Ms. Chiles returned in the black Mustang. Ms. Chiles stopped the car in the middle of the street and asked "what's going on?" ROA, Vol. II, at 34. Officer Osterdyk approached Ms. Chiles, identified himself as a Tulsa police officer, and showed her his badge. Officer Osterdyk then got in her car and directed her to pull into a nearby convenience store parking lot across the street,[1] which was where the officers had been conducting their surveillance.

Officer Osterdyk then had Ms. Chiles get out of the car, and he asked her if she had a driver's license or any other identification. She replied that she had not had a license for some time. After getting her name and information, Officer Osterdyk checked with the records division to see if she had a driver's license and

---

[1] It is unclear from the record precisely what Officer Osterdyk told Ms. Chiles. When Officer Osterdyk was cross-examined by defense counsel at the evidentiary hearing, the following exchange took place:

Q.    And then you directed her to move her vehicle somewhere else?
A.    Yes.
Q.    And that was to a corner of a convenience store?
A.    Yes, to get her out of the roadway.
Q.    So she knew you were an officer?
A.    She did.
Q.    And was following your directions?
A.    Yes.
Q.    And once you got her to the store, did you have her get out of the vehicle?
A.    Yes.

ROA, Vol. II, at 48.

3

any outstanding warrants. While he was waiting to receive that information, he asked Ms. Chiles if she had anything illegal in the car, and she said that she did not. He then asked her if "she minded if [he] looked real quick and she said, no, go ahead, there's nothing to hide." ROA, Vol. II, at 35. Officer Osterdyk looked around the front compartment of the car and found a bag that contained what appeared to be methamphetamine. Although the substance was not field tested, Ms. Chiles "acknowledged that it was an illegal substance." ROA, VOL. II at 54. Ms. Chiles was not arrested, but was told by Officer Osterdyk that the police were more interested in Fox.[2] She replied that Fox was her husband and that they lived together. Officer Osterdyk asked if she was on the lease for the house, and she said that she was. He also asked her if there was anything illegal in their house, and she said "nothing that she knew of." ROA, Vol. II, at 37. Officer Osterdyk then asked if the police could search the house, and she responded: "that would be fine. There's nothing to hide." ROA, Vol. II, at 38. Officers Osterdyk and Lamb then walked over to the house with Ms. Chiles, and she unlocked the door, letting the officers inside.

Once inside the house, the officers asked if she would sign a search waiver form, and she said that she would. Although the officers did not have a waiver

---

[2] At the evidentiary hearing, Officer Osterdyk testified that he told Ms. Chiles "that we were more interested in the individual that we were doing surveillance on," and he mentioned Fox by name. ROA, Vol. II, at 37.

form with them, they began to search the house. While searching Fox's bedroom, the officers discovered a sawed-off shotgun and ammunition. Following the search, the officers obtained a search waiver form, "read over it with [Ms. Chiles], explained everything on it, and asked her if she understood." ROA, Vol. II, at 39. She then signed the form.

Throughout the encounter, the officers spoke in a calm, conversational tone with Ms. Chiles. They never displayed their weapons, nor did they make any explicit threats or promises.

As a result of the officers finding the shotgun and ammunition in his house, Fox was indicted on one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) and one count of possession of an unregistered shotgun with a barrel less than 18 inches long, in violation of 26 U.S.C. §§ 5841, 5845(a), 5861(d), and 5871. Fox filed a motion to suppress the evidence found in his home, arguing that Ms. Chiles's consent to search the home was not voluntary. The district court held an evidentiary hearing and denied Fox's motion to suppress, ruling that Ms. Chiles voluntarily consented to the search. Fox sought reconsideration of the district court's order, arguing that the testimony elicited at the evidentiary hearing indicated that Ms. Chiles was illegally seized, and thus, her subsequent consent was invalid under Brown v. Illinois, 422 U.S. 590 (1975). The district court ruled that the encounter between Officer Osterdyk and Ms. Chiles was consensual and not a seizure, and even if

5

she was illegally seized, application of the Brown factors indicated that her subsequent consent to search the home was not tainted by any illegality.

Fox entered a conditional guilty plea to count two of the indictment, knowing possession of an unregistered sawed-off shotgun, reserving the right to appeal the denial of his motion to suppress. The government dismissed count one of the indictment, being a felon in possession of a firearm and ammunition. The district court sentenced Fox to 48 months' imprisonment. Fox appeals the denial of his motion to suppress the evidence found in his home.

II

In reviewing the denial of a motion to suppress, we review the factual findings of the district court for clear error, viewing "the evidence in the light most favorable to the government." United States v. Chavez, 534 F.3d 1338, 1343 (10th Cir. 2008) (quotation omitted). We "review de novo the reasonableness of the government's action under the Fourth Amendment." Id.

A warrantless search of an individual's home is "per se unreasonable under the Fourth Amendment unless the government can show that it falls within one of a carefully defined set of exceptions." United States v. Cos, 498 F.3d 1115, 1123 (10th Cir. 2007) (quotation omitted). Here, the government relied on Ms. Chiles's consent to search the home as an exception to the general warrant requirement. Fox argues that Ms. Chiles's consent was invalid because it was tainted by a prior illegal seizure and, as a result, her consent was not voluntary.

6

When a consensual search follows a Fourth Amendment violation, the government must prove both (1) that the consent was voluntary under the totality of the circumstances, and (2) that there was "a break in the causal connection between the illegality and the evidence thereby obtained." United States v. Melendez-Garcia, 28 F.3d 1046, 1053 (10th Cir. 1994) (internal citations, quotation, and footnote omitted). "Although the two requirements will often overlap to a considerable degree, they address separate constitutional values and they are not always coterminous." Id. at 1054. "We require the government to demonstrate that any taint of an illegal search or seizure has been purged or attenuated not only because we are concerned that the illegal seizure may affect the voluntariness of the defendant's consent, but also to effectuate the purposes of the exclusionary rule." Id.

**A**

In order to determine whether Ms. Chiles's consent was tainted by an unlawful seizure, we must first determine whether Ms. Chiles was unlawfully seized. We review de novo the district court's determination that the encounter between Ms. Chiles and the police was consensual and not a seizure. See United States v. Abdenbi, 361 F.3d 1282, 1291 (10th Cir. 2004).

We have identified three general categories of encounters between police and citizens:

(1) consensual encounters which do not implicate the Fourth

7

Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.

United States v. Lopez, 443 F.3d 1280, 1283 (quoting United States v. Torres-Guevara, 147 F.3d 1261, 1264 (10th Cir. 1998)). Fox argues that although the encounter was initially consensual when Ms. Chiles stopped her car and asked what was going on, it soon became a seizure. Specifically, he contends that when Officer Osterdyk entered Ms. Chiles's car and directed her to drive to a nearby parking lot, Ms. Chiles was seized under the Fourth Amendment. We agree.

"[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that [s]he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980). The critical inquiry is whether "the police conduct would have communicated to a reasonable person that [s]he was not at liberty to ignore the police presence and go about [her] business." Florida v. Bostick, 501 U.S. 429, 437 (1991) (quotation omitted).

In determining whether an individual has been seized, we have considered several factors, including:

(1) the threatening presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by an officer; (4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention of a person's

8

personal effects; (6) a request to accompany the officer to the police station; (7) interaction in a small, enclosed, or non-public place; and (8) absence of other members of the public.

United States v. Rogers, 556 F.3d 1130, 1137–38 (10th Cir. 2009). No single factor is dispositive, and this list is not exhaustive. Id. at 1138. Another relevant factor that suggests an encounter is not consensual is whether the officer advised an individual that she is free to leave. United States v. Ledesma, 447 F.3d 1307, 1314 (10th Cir. 2006).

With these principles in mind, we conclude that under the totality of the circumstances, a reasonable person in Ms. Chiles's position would not have felt free to ignore Officer Osterdyk's presence in her car and go about her business. The initial encounter between Officer Osterdyk and Ms. Chiles, when Ms. Chiles stopped her car and asked the officers what was going on, was consensual. However, Officer Osterdyk's subsequent actions changed the nature of the encounter from a consensual encounter to a seizure. See Lopez, 443 F.3d at 1284 ("[I]t is settled that the nature of the police-citizen encounter can change—what may begin as a consensual encounter may change to an investigative detention if the police conduct changes and vice versa." (quotation omitted)). Officer Osterdyk identified himself as a police officer, displayed his badge, entered Ms. Chiles's car,[3] directed her to drive to a nearby parking lot, and never advised her

---

[3] We note that there is no indication in the record that Officer Osterdyk
(continued...)

9

that she was free to leave. Under these circumstances, the officer's coercive show of authority would communicate to a reasonable person that she was not free to terminate the encounter. Cf. United States v. Elliott, 107 F.3d 810, 814 (10th Cir. 1997) (considering as a "coercive show of authority" whether an officer was leaning against or touching an individual's car). Although the government contends that Ms. Chiles could have told Officer Osterdyk to get out of her car, we do not think that under the circumstances a reasonable person would have felt free to do so. Accordingly, we conclude that Ms. Chiles was seized within the meaning of the Fourth Amendment.

Because we conclude that Ms. Chiles was seized, we must next determine whether that seizure was lawful. An individual "may not be detained even momentarily without reasonable, objective grounds for doing so . . . ." Florida v. Royer, 460 U.S. 491, 498 (1983). The reasonableness of investigative detentions is outlined in Terry v. Ohio, 392 U.S. 1 (1968), which also applies to traffic stops. See United States v. Stephenson, 452 F.3d 1173, 1176 (10th Cir. 2006). Investigative detentions are reasonable if "the detaining officer has a reasonable suspicion that criminal activity may be afoot." Stephenson, 452 F.3d at 1176.

[3](...continued)
asked permission to enter Ms. Chiles's car or that she invited him into her car. Cf. United States v. Spence, 397 F.3d 1280, 1284 (10th Cir. 2005) (concluding that an encounter was consensual and noting that "agents asked for permission to enter [the defendant's] home and that [the defendant] invited them inside").

Reasonable suspicion requires "'a particularized and objective basis' for suspecting the person stopped of criminal activity . . . ." Ornelas v. United States, 517 U.S. 690, 696 (1996) (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)).

The government has not argued (either to the district court or on appeal) that the seizure of Ms. Chiles was supported by reasonable suspicion. Additionally, our review of the record indicates that the officers did not have reasonable suspicion to justify the seizure.[4] The district court made no determination regarding reasonable suspicion. Rather, the district court appears to have justified the intrusion because "it was the easiest way to get her out of the street . . . ." ROA, Vol. II, at 77. In addition to being factually dubious, this conclusion does not address whether the seizure was justified by reasonable suspicion of criminal activity. Regardless of whether it was the easiest way to get her out of the street, it was a seizure, and therefore, must be supported by reasonable suspicion. See United States v. Alarcon-Gonzalez, 73 F.3d 289, 292–93 (10th Cir. 1996) ("[W]hether or not the command to 'freeze' was justified is immaterial because its effect was to turn the encounter that followed into a

---

[4] At the evidentiary hearing, Officer Dupler testified he received information from the confidential informant on "the female involved." ROA, Vol. II, at 18. When asked what information he had "on the female," Officer Dupler said: "Oh, drugs. Same kind of issue, I think." ROA, Vol. II, at 18. This single, vague statement does not constitute reasonable and articulable suspicion that would have justified detaining Ms. Chiles.

11

nonconsensual seizure. . . . Once the reason that justified the initial stop is dispelled, further detention unsupported by reasonable suspicion violates the Fourth Amendment."). Because the officers did not have reasonable suspicion to detain Ms. Chiles, the seizure was unlawful. See id.[5]

## B

We now turn to whether the unlawful seizure rendered Ms. Chiles's consent to search the home invalid and the subsequently discovered evidence inadmissible. See Wong Sun v. United States, 371 U.S. 471, 487–88 (1963). To demonstrate that the taint of an illegal seizure has dissipated, "the government must prove, from the totality of the circumstances, a sufficient attenuation or break in the causal connection between the illegal detention and the consent." United States v. Gregory, 79 F.3d 973, 979 (10th Cir. 1996) (quotation omitted). This is a heavy burden. See id. In Brown v. Illinois, the Supreme Court articulated three factors especially relevant to this inquiry: "1) the temporal proximity between the police illegality and the consent to search; 2) the presence of intervening circumstances; and particularly 3) the purpose and flagrancy of the official misconduct." Melendez-Garcia, 28 F.3d at 1054 (citing Brown, 422 U.S. at 603–04). Because this analysis is fact-intensive, "the district court's findings

---

[5] Additionally, we note that there is no suggestion that the seizure was supported by probable cause. See United States v. Sokolow, 490 U.S. 1, 7 (1989) ("[T]he level of suspicion required for a Terry stop is obviously less demanding than that for probable cause.").

12

must be upheld unless they are clearly erroneous." United States v. Eylicio-Montoya, 70 F.3d 1158, 1165 (10th Cir. 1995). A factual finding is clearly erroneous if "it is without factual support in the record or, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made." United States v. Barnhardt, 93 F.3d 706, 710 (10th Cir. 1996).

Beginning with the first factor, the district court found there was close temporal proximity between Ms. Chiles's seizure and her subsequent consent to search the house. The record does not reveal the exact length of the encounter between Ms. Chiles and Officer Osterdyk, but during that encounter, Ms. Chiles drove across the street to a parking lot, Officer Osterdyk ran a records check, and he searched the front compartment of her car. The district court concluded that this close temporal proximity weighs against a finding of attenuation. We agree. See United States v. McSwain, 29 F.3d 558, 563 (10th Cir. 1994) (first factors "weigh[ed] heavily against finding the taint cleansed" where the defendant consented "only a few minutes after being illegally detained"); United States v. Mendoza-Salgado, 964 F.2d 993, 1012 (10th Cir. 1992) (thirty to forty-five minute period by itself "reveal[ed] little about whether the [time] that elapsed had any effect on [the] decision to permit the search"); United States v. Maez, 872 F.2d 1444, 1455 (10th Cir. 1989) (thirty minute time period between "the arrest and Mrs. Maez' consents clearly indicate that [the] taint [of the Fourth Amendment] violation was not purged").

13

Turning to the second <u>Brown</u> factor, the district court found that there was an intervening circumstance, stating:

> [T]here was a significant intervening circumstance, namely at the time [Ms. Chiles] consented to search, she had voluntarily agreed to let the officers inside, had walked them up to the house, and had let them into the home with a key.
>
> The intervening circumstances, or the intervening circumstance in this case was the other [sic] lack of confinement, interrogation or any other coercive circumstance at the time she consented to the search.
>
> Thus, the consent to search was not given in any type of detention setting.

ROA, Vol. II, at 78. This finding was clearly erroneous.

The district court clearly erred in suggesting that Ms. Chiles's voluntary consent itself was an intervening circumstance. Her consent is not in itself an intervening event which could remove the taint of the prior illegal seizure. <u>See</u> <u>Melendez-Garcia</u>, 28 F.3d at 1054 (clarifying the distinction between the "dual requirement" that consent be voluntary in fact and free of the taint of police illegality, and rejecting the rule that "consent that is voluntary in fact is in itself an intervening act that purges any police illegality"). Under the facts presented, there was no basis for finding an intervening circumstance.

Under the second <u>Brown</u> factor, "there must be proof of facts or events which ensure that the consent provided . . . [was] not the fruit of the illegal [seizure]. The facts or events must create a discontinuity between the illegal [seizure] and the consent such that the original illegality is weakened and attenuated." <u>Gregory</u>, 79 F.3d at 980; <u>see also</u> <u>United States v. Reed</u>, 349 F.3d

14

457, 464 (7th Cir. 2003) ("The type of intervening events that serve to attenuate official misconduct are those that sever the causal connection between the illegal [seizure] and the discovery of the evidence."). Some examples of intervening circumstances include "carefully explain[ing]" a consent form and advising an individual of the right to withhold consent, see Mendoza-Salgado, 964 F.2d at 1012,[6] "release from custody, an appearance before a magistrate, or consultation with an attorney," United States v. Washington, 387 F.3d 1060, 1074 (9th Cir. 2004), to name a few. After reviewing the record, we conclude there were no intervening events that would have broken or attenuated the causal connection between the illegal seizure and the consent. Thus, the district court clearly erred in concluding that this factor weighed towards a finding of attenuation.

Finally, we look at the third factor, whether the officer's misconduct was purposeful or flagrant. The district court found that "any official misconduct that did occur was in no way flagrant. The Court finds that nothing the police did during the alleged detention would have impacted Chiles' decision to consent to

---

[6] According to the officers' testimony, Ms. Chiles signed a consent form, and Officer Osterdyk went over the form with her and told her that she had the right to tell him to stop searching at any point. ROA, Vol. II, at 52. However, the officers went over the form with Ms. Chiles after they had already obtained the initial consent and searched the house. Thus, we do not see how this could be an "intervening" event. See United States v. Santa, 236 F.3d 662, 678 (8th Cir. 2000) ("[T]he fact that [the defendant] signed a consent form after the search was complete does not persuade us that his consent was not the product of the illegal arrest.").

15

search." ROA, Vol. II, at 78. But the inquiry under this factor is not whether the officers' conduct—apart from the illegal seizure—coerced Ms. Chiles to consent. See Reed, 349 F.3d at 465 ("'[P]urposeful and flagrant' misconduct is not limited to situations where police act in an outright threatening or coercive manner . . . ."). Rather, purposeful and flagrant misconduct is generally found where: "(1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed 'in the hope that something might turn up.'" United States v. Simpson, 439 F.3d 490, 496 (8th Cir. 2006) (quoting Brown, 422 U.S. at 605). Additionally, it may be significant that the "officers ha[d] no right whatsoever to detain the person from whom consent is sought." Melendez-Garcia, 28 F.3d at 1055–56; see also United States v. Chanthasouxat, 342 F.3d 1271, 1280 (11th Cir. 2003) (noting that the third factor "weigh[ed] toward suppression because . . . the initial stop violated Defendants' Fourth Amendment rights"). It does not appear from the record that the district court conducted the proper analysis under the third Brown factor.

In discussing whether Ms. Chiles was seized, the district court found that Officer Osterdyk "[e]ntered the car merely because he was on foot, it was the easiest way to get [Ms. Chiles] out of the street and he directed her to a nearby parking lot." ROA, Vol. II, at 77. Arguably, this finding might weigh against the flagrancy and purposefulness of the officer's conduct. However, the district

16

court's conclusion is without support in the record. Officer Osterdyk did not explain why he got in Ms. Chiles's car. Indeed, he never testified that he got in her car at all; that information came to light only during the testimony of the government's final witness, and Officer Osterdyk's partner, Officer Lamb. The district court's conclusion that the seizure was merely "the easiest way to get her out of the street," ROA, Vol. II, at 77, is not supported by the record, is pure speculation, and is not a reasonable inference.

The record suggests that the officer's conduct was purposeful and flagrant. Without probable cause or an articulable reasonable suspicion justifying the seizure of Ms. Chiles, see Melendez-Garcia, 28 F.3d at 1055–56, Officer Osterdyk got in her car and directed her to drive across the street to a parking lot where the police were conducting surveillance. Once there, he asked for her identification, learned that she did not have a license, and then asked to search her car. Upon searching her car he found what he thought were illegal drugs and told Ms. Chiles that they were "more interested" in Fox. ROA, Vol. II, at 37. At that point, she said that Fox was her husband and they lived together; Officer Osterdyk then asked if she was on the lease to the house, and then asked for her consent to search the house. At no time did the officers inform Ms. Chiles that she was free to leave. See United States v. Fernandez, 18 F.3d 874, 882 (10th Cir. 1994) (although not a prerequisite, informing an individual of the right to refuse consent is "a factor particularly worth noting"). These circumstances

17

indicate that Officer Osterdyk detained Ms. Chiles "with a quality of purposefulness, embarking upon a fishing expedition in the hope that something might turn up." McSwain, 29 F.3d at 563 (internal quotations and citations omitted). This factor also weighs against a finding that the taint of the illegal seizure had been purged.

After reviewing the totality of the circumstances, including the three Brown factors, and viewing the evidence in the light most favorable to the government, we conclude that the district court clearly erred in finding that there was sufficient attenuation between the illegal seizure of Ms. Chiles and her subsequent consent. See id. (circumstances indicated that the taint was not purged—the officer leaned over and rested his arm on the driver's door when asking for consent, did not specifically inform the driver that he was free to leave or refuse to consent, and the illegality had a quality of purposefulness). We are left with the firm conviction that the government failed to meet its heavy burden of establishing that Ms. Chiles's consent was purged of the taint of her unlawful seizure. Accordingly, the evidence found as a result of that consent must be suppressed.[7]

---

[7] Because we conclude that the district court clearly erred in determining that the taint of the illegal seizure was sufficiently attenuated, we need not address Fox's separate argument that Ms. Chiles's consent was not voluntary under Schneckloth v. Bustamonte, 412 U.S. 218 (1973).

18

## III

We REVERSE the district court's denial of Fox's motion to suppress and REMAND for further proceedings.