FILED
United States Court of Appeals
Tenth Circuit

February 27, 2018

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

EVERETT REA RAMOS,

        Defendant - Appellant.

No. 17-2013
(D.C. No. 1:15-CR-03940-JB-1)
D. New Mexico

---

**ORDER AND JUDGMENT**[*]

---

Before **PHILLIPS**, **KELLY**, and **MURPHY**, Circuit Judges.

---

**I.**     **Introduction**

Defendant–Appellant Everett Ramos entered a conditional guilty plea to

one count of possession of methamphetamine with intent to distribute, in violation

of 21 U.S.C. § 841(a)(1) and (b)(1)(A). Ramos appeals his conviction, asserting

the district court erred by refusing to suppress evidence seized during a traffic

stop. *See* Fed. R. Crim. P. 11(a)(2) (providing that a defendant may, under

certain circumstances, enter a conditional guilty plea but reserve the right to

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

appeal an adverse determination of a pretrial motion). Our jurisdiction arises under 28 U.S.C. § 1291.

Although it cannot be determined from the appellate record whether the traffic stop involved a Fourth Amendment violation, we **affirm** the district court's denial of the motion to suppress based on the attenuation doctrine.

## II.    Factual Background

On October 15, 2015, New Mexico State Police Officer Joshua Campos stopped a Mercedes sedan for speeding. Ramos was the driver of the vehicle and his wife, Laura Perez, was in the front passenger's seat. At the time of the stop, Officer Campos was driving a marked police car and was dressed in uniform. Before approaching the car, Campos was told by dispatch that the Mercedes was "negative on any wants for warrants."

Officer Campos asked Ramos for his driver's license, vehicle registration, and proof of insurance. After Ramos produced the documents, which included a rental agreement for the Mercedes, Officer Campos asked him to exit the vehicle. While he filled out the citation form, Officer Campos asked Ramos about his travel plans. Ramos said that he and Ms. Perez had traveled from California to Las Vegas to Albuquerque. They were headed to San Antonio to visit Ms. Perez's friend. Although Ramos first told Officer Campos that he and Ms. Perez had come to Albuquerque to sightsee, he subsequently told Campos they were "passing by" Albuquerque. Officer Campos, however, noted the route Ramos

-2-

was taking to San Antonio was longer than necessary by approximately four hours. Further, although Ramos's final destination was Texas, the rental agreement showed that Ramos was allowed to drive the vehicle "ONLY" in California, Nevada, and Arizona.

Before completing the citation, Campos walked to the Mercedes to examine its vehicle identification number ("VIN"). Officer Campos examined the VIN in the lower portion of the dashboard by looking through the driver's side window. This took him approximately six to eight seconds. A second VIN is located inside the doorjamb of the driver's door. At the suppression hearing, Officer Campos testified he routinely compares the VIN on the front dashboard with the VIN on the doorjamb to ensure they match and because either or both locations might reveal tampering or other evidence of crime. Officer Campos opened the driver's door of the Mercedes, but did not reach his hand into the passenger compartment or touch any items inside the vehicle. While he checked the doorjamb VIN, Officer Campos asked Ms. Perez many of the same travel-related questions he had asked Ramos. Her answers were different than the ones Ramos had given and she changed her story throughout the conversation.[1] Based on the discrepancies in the two stories, Campos suspected criminal activity.

---

[1]In addition to giving contradictory answers, Officer Campos testified that Ms. Perez appeared "nervous" and "very distracted," her hands were shaking, and she paused before answering his questions. During the encounter, Ms. Perez received multiple notifications on one of the two cell phones in her possession.

Officer Campos spent one minute and twenty seconds inspecting the doorjamb VIN. He testified that during some of this time he was attempting to locate the VIN on the car's rental agreement. He also testified that he looked "back and forth" between Ms. Perez and the VIN for safety reasons so he could ensure Ms. Perez was not reaching for something that could injure him. He admitted, however, that at the end of the encounter he was looking only at Ms. Perez and no longer looking at the doorjamb VIN or the rental agreement.

After questioning Ms. Perez, Officer Campos walked back to his patrol car and handed Ramos a citation, together with his driver's license and rental contract. Campos told Ramos he was free to leave and Ramos began walking toward the Mercedes. Officer Campos then called out "Excuse me, sir," which caused Ramos to walk back toward the police car. Campos asked Ramos if he could ask him a few more questions, and Ramos agreed. Officer Campos then asked more detailed questions about Ramos's travel plans. During this questioning, Ramos could not recall the last name of the person with whom he would be staying in Texas, despite allegedly knowing her since 1989. When Campos inquired regarding the rental agreement not authorizing driving in New Mexico, Ramos stated that Ms. Perez had altered the agreement. Campos noted that the rental agreement required Ramos to return the vehicle in three days, but the trip Ramos described would make that impossible.

While Officer Campos questioned Ramos, Ms. Perez left the Mercedes, walked toward the police car, and told Officer Campos she wanted to take the vehicle to the nearest gas station to use the restroom. Officer Campos refused permission to drive away, and instructed Ms. Perez to "hang out in the car." When Ms. Perez continued to take steps toward Officer Campos, he again told her to return to the Mercedes, this time using a louder voice and a stern tone.

After completing his questioning of Ramos, Officer Campos walked back to the Mercedes and asked Ms. Perez if she would answer more questions. She agreed. During this second round of questioning, Ms. Perez again received multiple alerts on her cell phone. Officer Campos asked Ms. Perez the same questions he had asked Ramos, but this time her story matched Ramos's story. Ms. Perez did not explain why her answers were different from what she had said earlier.

Officer Campos returned to his police car, where Ramos was still standing. He asked Ramos whether the Mercedes contained any narcotics, which Ramos denied. Officer Campos then asked Ramos for consent to search the vehicle and property within the vehicle. Ramos consented, filling out a form acknowledging his consent. After a preliminary search for dangerous items, Officer Campos deployed his K-9, who alerted to the trunk. Inside the trunk, Campos found approximately six packages covered in black axle grease. Campos testified that

drug trafficking organizations use axle grease to conceal the odor of narcotics. Officer Campos arrested Ramos and Ms. Perez.

The grand jury returned an indictment against Ramos, charging him with one count of possession with intent to distribute at least 500 grams of methamphetamine. Ramos filed a motion to suppress the evidence seized from the Mercedes and the district court held an evidentiary hearing on the motion. Officer Campos testified at the hearing and the videotape of the traffic stop was played for the court.

The district court denied Ramos's motion, concluding Officer Campos did not unlawfully extend the traffic stop, either by examining the two VINs or by talking to Ms. Perez. Although the district court found that it should have taken no longer than thirty seconds to check the doorjamb VIN, it also concluded reasonable suspicion developed no later than twenty seconds into Campos's conversation with Ms. Perez. Thus, the court ruled, the questioning of Ms. Perez did not unlawfully extend the duration of the traffic stop because reasonable suspicion developed while Officer Campos was performing tasks related to the stop and any subsequent detention did not violate the Constitution. The district court also found that Ramos was still detained when he consented to the search of the Mercedes but his consent was nevertheless freely and voluntarily given. *See United States v. Contreras*, 506 F.3d 1031, 1037 (10th Cir. 2007) ("[A] person may voluntarily consent to a search even while being legally detained."). In the

alternative, the court ruled Ramos's consent and the search were sufficiently attenuated from any unconstitutional detention. *See United States v. Fox*, 600 F.3d 1253, 1257 (10th Cir. 2010) ("When a consensual search follows a Fourth Amendment violation, the government must prove both (1) that the consent was voluntary under the totality of the circumstances, and (2) that there was 'a break in the causal connection between the illegality and the evidence thereby obtained.'").

Ramos pleaded guilty, preserving his right to appeal the denial of his suppression motion.

## III. Discussion

### A. Standard of Review

"When reviewing [the denial of] a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless they are clearly erroneous, and review de novo the ultimate question of reasonableness under the Fourth Amendment." *United States v. Pettit*, 785 F.3d 1374, 1378-79 (10th Cir. 2015). The question of whether consent to search was given voluntarily is one of fact, determined from the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). If a consensual search is preceded by a Fourth Amendment violation, we

review de novo whether evidence seized during the search should be suppressed.[2]
*United States v. Carter*, 360 F.3d 1235, 1243 (10th Cir. 2004).

### B.  The VIN Inspection

An investigative detention "remains lawful only so long as unrelated inquiries do not measurably extend the duration of the stop."  *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) (quotation and alteration omitted).  Ramos does not assert the initial traffic stop was unlawful but argues, as he did before the district court, that Officer Campos unlawfully extended the duration of the traffic stop when he examined the doorjamb VIN and conversed with Ms. Perez.  According to Ramos, there was no legitimate reason to examine the doorjamb VIN because Officer Campos did not suspect the Mercedes was stolen, did not need to correctly identify the vehicle before completing the speeding citation, was not motivated by officer safety concerns, and had already determined from his inspection of the dashboard VIN that no evidence of tampering existed.  Thus, Ramos asserts, the examination of the doorjamb VIN unlawfully extended the duration of the traffic stop.  *See United States v. Hunnicutt*, 135 F.3d 1345, 1349

---

[2]Ramos is challenging the admissibility of the drugs found during the search of the Mercedes.  Although this search did not occur during Officer Campos's examination of the VIN, Ramos argues the evidence was derivative of the illegal detention.  *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) ("[T]he exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and, relevant here, evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree." (quotations omitted)).

(10th Cir. 1998) (holding an investigative detention should "last no longer than is necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification" (quotation and alteration omitted)).

Ramos argues the examination of the doorjamb VIN unreasonably extended the stop because VIN inspections are not within the permissible scope of a routine traffic stop which only includes "ordinary inquiries incident to such a stop." *Illinois v. Caballes*, 543 U.S. 405, 408 (2005). In *New York v. Class*, however, the Supreme Court held that "a demand to inspect the VIN, like a demand to see license and registration papers, is within the scope of police authority pursuant to a traffic violation stop." 475 U.S. 106, 115, 118-19 (1986) (holding the locations of both VINs are not subject to a reasonable expectation of privacy). Thus, Ramos's argument is foreclosed by Supreme Court precedent.

Ramos nevertheless relies on this court's opinion in *United States v. Caro*, 248 F.3d 1240 (10th Cir. 2001), for the proposition that law enforcement officers need a specific justification to examine *both* the dashboard VIN and the doorjamb VIN.[3] In *Caro*, we held that when the dashboard VIN can be inspected from

---

[3]In *Class*, the officer examined the dashboard VIN only after he was unable to locate a VIN on the doorjamb. *New York v. Class*, 475 U.S. 106, 108 (1986); *see also id*. at 118 ("The VIN . . . is by law present in one of two locations—either inside the doorjamb, or atop the dashboard . . . . The officer here checked both those locations, and only those two locations.").

outside the vehicle, a police officer may not enter the passenger compartment to check the VIN on the doorjamb. *Id*. at 1246. *Caro* provides no support for Ramos's argument because this court has expressly limited its application to situations "when (1) the officer has verified the dashboard or doorjamb VIN from outside the passenger compartment and (2) the officer nevertheless physically enters the passenger compartment to check the VIN." *United States v. Chavira*, 467 F.3d 1286, 1289 n.1 (10th Cir. 2006). "There is no unlawful detention under *Caro* if the officer remains physically outside the car when he examines the VIN on the dashboard, the doorjamb, or both." *Id*. Here, Ramos does not challenge the district court's finding that Officer Campos did not physically enter the passenger compartment of the Mercedes. *United States v. Ramos*, 194 F. Supp. 3d 1134, 1144 (D. N.M. 2016). Thus, *Caro* does not apply.

*Class* and *Caro*, however, do not resolve the question of whether Officer Campos unreasonably extended the traffic stop by continuing to question Ms. Perez after he confirmed there was nothing suspicious about the doorjamb VIN. *See Rodriguez*, 135 S. Ct. at 1614-15 (holding "that a traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a warning ticket" (quotation and alteration omitted)). The district court found that Officer Campos spent six to eight seconds examining the dashboard VIN and one minute twenty-six seconds inspecting the doorjamb VIN. *Ramos*, 194 F. Supp. 3d at 1145. After first acknowledging it did "not have

extensive evidence on how long an individual VIN inspection usually takes," *id.*
at 1142, the district court found that "inspecting [the] VIN to ensure that it had
not been tampered with and scanning the rental agreement to locate a VIN, which
was not present on the agreement, could reasonably take around thirty seconds."
*Id*. at 1172.  This thirty-second period included the time Officer Campos
observed Ms. Perez to "ensure she was not reaching for a weapon."  *Id*.  The
district court further concluded that Officer Campos developed reasonable
articulable suspicion of illegal activity approximately twenty seconds into his
questioning of Ms. Perez.[4]  *Id*. at 1174.  Because twenty seconds was within the

---

[4]The district court credited Officer Campos's testimony that within twenty
seconds of questioning, Ms. Perez "corrected an aspect of her story" and then
gave an answer that contradicted Ramos's answers.  *United States v. Ramos*, 194
F. Supp. 3d 1134, 1174 (D. N.M. 2016).  The district court referenced the
following facts as supporting its conclusion that Officer Campos had reasonable
articulable suspicion of illegal activity.  First, "Ramos told Campos that they
[traveled] from Los Angeles, California to Las Vegas, Nevada to Albuquerque,
and were headed to San Antonio, even though Albuquerque was a significant
detour from the quickest route to San Antonio."  *Id*. at 1173.  "Ramos also
informed Campos that he was traveling to Albuquerque for "sightseeing.  Despite
this assertion, Ramos said that they left Las Vegas around three in the morning
and passed straight through Albuquerque."  *Id*. (record citation omitted).
Additionally, "Campos noticed that the rental agreement allowed Ramos to drive
the vehicle 'ONLY' in California, Nevada, and Arizona.  Regardless, Campos saw
that someone had handwritten numerous states into the rental agreement."  *Id*.
(record citations omitted).  Campos also "observed that Perez had two cellular
telephones and 'was receiving multiple phone calls' and kept ignoring them.  He
noted that Perez was 'very distracted' and nervous."  *Id*. (record citations
omitted).  Finally, "early in his questioning, Campos noticed that Perez had
corrected an aspect of her story.  Perez initially said that they were returning to
California, but later she said that they were going to Texas."  *Id*. at 1174 (record
(continued...)

-11-

thirty-second time period the district court found was reasonably necessary to perform the VIN inspection and related tasks, the district court concluded the questioning of Ms. Perez did not unreasonably extend the traffic stop. *Id*.

Ramos challenges the district court's finding that Officer Campos reasonably needed thirty seconds to inspect the doorjamb VIN. Although the government asserts the district court's finding is supported by record evidence, our review of the record did not confirm this assertion. The evidence to which the government directs us addresses whether the tasks Officer Campos performed as part of the doorjamb VIN inspection were necessary.[5] The evidence does not address the relevant question of how long it takes a reasonable officer to complete those tasks. Because there is no record support for the district court's finding that it takes thirty seconds to check the doorjamb VIN on a rental car

---

[4](...continued)
citations omitted). "Campos then detected a discrepancy between Ramos' account of their travel plans and Perez' account. Perez told Campos that they had come straight from California and had not stopped anywhere, even though Ramos said that they went to Las Vegas, which was a detour from their trip to Texas." *Id*. (record citation omitted).

[5]The only relevant facts that inform the issue are the district court's findings that Officer Campos spent six to eight seconds examining the dashboard VIN, *Ramos*, 194 F. Supp. 3d at 1142, and "several seconds" looking at Ms. Perez for officer safety reasons, *id*. at 1173. The district court also stated that "Campos *may* have spent some time trying to locate the VIN on the rental agreement." *Id*. at 1142 (emphasis added). This, however, is not an unequivocal factual finding. Further, there is no discussion of whether Officer Campos spent the same amount of time attempting to locate the VIN on the rental agreement when he examined the dashboard VIN.

when a passenger is seated in the vehicle, the finding is clearly erroneous. *United States v. Haymond*, 869 F.3d 1153, 1157 (10th Cir. 2017) ("A finding of fact is clearly erroneous if it is without factual support in the record . . . ." (quotation omitted)). The district court erred by relying on this clearly erroneous factual finding to support its conclusion that Officer Campos did not unreasonably extend the duration of the traffic stop. Thus, even if we agree that Officer Campos developed reasonable articulable suspicion of criminal activity within twenty seconds, we cannot affirm the district court on that basis.

### C. Consent to Search

Because the record lacks a factual basis supporting the district court's ruling that the investigative detention was not unlawfully extended by Officer Campos's questioning of Ms. Perez, we proceed in the analysis by assuming the detention was unlawful. "When a consensual search is preceded by an unlawful arrest, the government must prove the consent was given voluntarily. It must also establish a break in the causal connection between the illegality and the evidence thereby obtained." *United States v. Reeves*, 524 F.3d 1161, 1170 (10th Cir. 2008) (quotation omitted). We, thus, turn to the question of whether the evidence discovered during the search of the Mercedes is nonetheless admissible because Ramos's consent to search the vehicle was voluntary in fact and untainted by the prior unlawful detention. *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963); *United States v. Melendez-Garcia*, 28 F.3d 1046, 1055 (10th Cir. 1994)

-13-

(clarifying that "purging the taint of an illegal arrest requires an analysis beyond merely determining whether the consent was voluntary").

We first address the district court's finding that Ramos's consent was freely and voluntarily given.[6] The voluntariness of a defendant's consent to search "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. The district court's analysis of the issue is not only comprehensive but also faultless. The court acknowledged that Ramos was detained at the time he gave consent, but correctly noted that "[d]etention is only one factor to be considered in determining whether consent was voluntarily and freely given based on the totality of the circumstances." *Ramos*, 194 F. Supp. 3d at 1178 (quotation omitted). The district court then evaluated numerous other relevant factors, including that (1) the stop occurred in public view, (2) Ramos appeared calm and cooperative, (3) Officer Campos did not draw his sidearm or touch Ramos, (4) Ramos was not surrounded by multiple officers, (5) Officer Campos used a conversational tone, (6) Officer Campos did not withhold any of Ramos's personal items, (7) Ramos signed a written consent form which Officer Campos fully explained to him, and (8) the consent form clearly stated that Ramos had the right to refuse consent to the search. Ramos

---

[6]Although the district court concluded there was no Fourth Amendment violation associated with the VIN inspection, it was nevertheless required to address Ramos's alternative argument that the search was unlawful because he did not freely and voluntarily consent to it.

does not challenge any of these findings but asserts the district court ignored other facts that indicated his consent was nothing more than acquiescence to a claim of lawful authority. The district court did not ignore the facts Ramos references[7] and expressly acknowledged the "majority" of the relevant factors weighed in favor of finding Ramos's consent was voluntary. *Id*. at 1178. The court was clearly aware of, and considered, facts that weighed against a finding of voluntariness, *i.e.*, that Officer Campos raised his voice when he told Ms. Perez to get back into the Mercedes, that Ramos was detained when he gave consent, and that Officer Campos did not orally inform Ramos he was free to decline consent before Ramos verbally consented. *Id*. at 1178-79. This court, having reviewed the record and the district court's reasoning, has no hesitation in concluding the court did not clearly err in finding Ramos's consent was given freely and voluntarily.

This leads us to the final question in this matter: whether there was a "break in the causal connection between the illegality and the evidence thereby obtained." *Melendez-Garcia*, 28 F.3d at 1053-54 (quotation, citation, and

---

[7]The district court was clearly aware of the extent to which Officer Campos questioned both Ramos and Ms. Perez before asking for consent to search. *Ramos*, 194 F. Supp. 3d at 1144-45 (characterizing the questioning of Ms. Perez as "extensive"). It was also aware that Officer Campos asked Ramos about his luggage and whether he was transporting illegal items. *Id*. at 1147-49. Ramos does not reference any argument he made before the district court that these factors are dispositive of the voluntariness question rather than facts to be considered as part of the overall inquiry.

footnote omitted) (holding a district court must conduct an attenuation analysis even if it concludes the defendant's "consent was voluntarily under *Schneckloth*"). Pursuant to the attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016). The Supreme Court has set out three factors relevant to this inquiry: "1) the temporal proximity between the police illegality and the consent to search; 2) the presence of intervening circumstances; and particularly 3) the purpose and flagrancy of the official misconduct." *Melendez-Garcia*, 28 F.3d at 1054 (citing *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)). This is a fact-intensive analysis and "the district court's findings must be upheld unless they are clearly erroneous." *United States v. Eylicio–Montoya*, 70 F.3d 1158, 1165 (10th Cir. 1995).

As to the first factor, the district court found there was close temporal proximity between the seizure and Ramos's consent to search the Mercedes. *Ramos*, 194 F. Supp. 3d at 1183. The government does not deny that this factor weighs against attenuation.

As to the second *Brown* factor, the government must identify intervening events that "isolate[] the defendant from the coercive effects of the original

-16-

illegal stop." *United States v. Gregory*, 79 F.3d 973, 980 (10th Cir. 1996).

Ramos does not challenge the district court's conclusion that multiple intervening circumstances occurred here, *i.e.*, Officer Campos returned Ramos's documents to him; advised him that he was free to leave; fully explained the consent form, encouraging Ramos to ask questions; and specifically told Ramos he could revoke his earlier, verbal consent. *Ramos*, 194 F. Supp. 3d at 1184-85. Ramos argues, instead, that the district court erred by failing to view the intervening circumstances from his perspective. *See Gregory*, 79 F. 3d at 980 (stating the second *Brown* factor must be viewed from the "defendant's perspective"). Ramos argues the "intervening circumstances did more to heighten the coercive atmosphere than to attenuate it." Appellant's Br. at 38. Specifically, he asserts Officer Campos was aware that Ms. Perez urgently needed to use the restroom and he felt pressured into responding to Officer Campos's questions about Ms. Perez's health condition. That questioning, he alleges, "could only have conveyed to him that he was powerless to decline the officer's requests." *Id*. This argument—that Officer Campos's repeated refusal to permit Ms. Perez to use the restroom was a show of force—was addressed by the district court in its analysis of whether Ramos was detained at the time he consented to the search of the Mercedes. *Ramos*, 194 F. Supp. 3d at 1177. The court specifically concluded that Officer Campos's refusal to permit Ms. Perez to use the restroom "conveyed that he had the authority to detain Ramos and Perez." *Id*. Although the district

-17-

court did not thereafter reference this conclusion when it conducted the attenuation analysis, it is clear from the record that the court was fully aware Ramos gave his consent while he was being detained. *See Reeves*, 524 F.3d at 1170 (noting the overlap between the voluntariness and taint analyses). Thus, the record does not support Ramos's assertion that the court refused to analyze the second attenuation factor from his perspective.

"The exclusionary rule exists to deter police misconduct. The third factor of the attenuation doctrine reflects that rationale by favoring exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." *Strieff*, 136 S. Ct. at 2063. "[P]urposeful and flagrant misconduct is generally found where: 1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless and 2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up." *Fox*, 600 F.3d at 1261 (quotations omitted). Ramos bases his argument that Officer Campos's misconduct was flagrant on Campos's admission that he conducted the VIN inspection in order to investigate potential crimes other than speeding. Ramos asserts this admission shows that Officer Campos routinely conducts VIN inspections even though he knows they are unconstitutional. The problem with this argument is that VIN inspections are not *per se* unconstitutional. As discussed, precedent from Supreme Court and this

-18-

court permits law enforcement officers to inspect both the dashboard VIN and the doorjamb VIN as part of a routine traffic stop. *Class*, 475 U.S. at 118-19; *Chavira*, 467 F.3d at 1289 n.1. Here, the VIN inspection resulted in a Fourth Amendment violation, if at all, only because it prolonged this particular stop. Ramos has not identified any record evidence showing that Officer Campos routinely extends the duration of traffic stops when he conducts VIN inspections and he does not specifically identify any other evidence that supports his pretext argument or undermines the district court's finding that Officer Campos's "VIN inspection was pointed and narrow." *Ramos*, 194 F. Supp. 3d at 1186.

Further, as the district court noted, the record does not show that the questioning of Ms. Perez—the act that delayed the completion of the traffic stop—was "executed in the hope that something might turn up." *Fox*, 600 F.3d at 1261 (quotation omitted). To the contrary, Campos had already detected "oddities in Ramos' travel plans" when he began questioning Ms. Perez. *Ramos*, 194 F. Supp. 3d at 1187; *id.* at 1144 (describing Ramos's answers to routine travel questions). He testified he extended his questioning of Ms. Perez because he suspected "something was going on." *See Strieff*, 136 S. Ct. 2063 (concluding officer did not engage in a purposeful or flagrant violation of the Fourth Amendment even though his unlawful questioning of the defendant was motivated by his attempt to gather information about a suspected drug house).

-19-

Thus, the record supports the conclusion that Officer Campos's decision to question Ms. Perez was based on something more than an unsupported hunch.

After balancing the factors set out in *Brown v. Illinois*, we conclude the government met its burden of demonstrating that the discovery of evidence during the search of the Mercedes was sufficiently attenuated from any Fourth Amendment violation. Accordingly, suppression is not appropriate here.

## IV.    Conclusion

The district court's ruling denying Ramos's motion to suppress is **affirmed**.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge